# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Loren Noreen,

|                     |            |                              |
|---------------------|------------|------------------------------|
|                     | Plaintiff, | Civ. No. 14-2878 (RHK/SER)   |
| v.                  |            | **MEMORANDUM OPINION**       |
|                     |            | **AND ORDER**                |
| Pharmerica Corp.,   |            |                              |
|                     | Defendant. |                              |

---

Stephen J. Snyder, Brent C. Snyder, Snyder & Brandt, P.A., Minneapolis, Minnesota, for Plaintiff.

Heather M. Muzumdar, Deborah S. Brenneman, Keith P. Spiller, Thompson Hine LLP, Cincinnati, Ohio, Jessica S. Pecoraro, John Thomas Duffey, R. Christopher Sur, Maslon LLP, Minneapolis, Minnesota, for Defendant.

---

## INTRODUCTION

Plaintiff Loren Noreen worked for Defendant Pharmerica Corporation ("Pharmerica") as a staff pharmacist in Fridley, Minnesota, for more than 38 years. After Pharmerica terminated his employment in December 2013, he commenced this action alleging age discrimination in violation of federal and state law. Presently before the Court is Pharmerica's Motion for Summary Judgment. For the reasons that follow, the Motion will be granted.

## BACKGROUND

When viewed in the light most favorable to Noreen, the record reveals the following facts. The Court notes, however, that most of the pertinent facts are undisputed.

## I.      Pharmerica and Noreen

Pharmerica is an institutional pharmacy, meaning it provides pharmaceuticals and related supplies to institutional clients such as long-term care facilities and nursing homes.  (Rife Decl. ¶ 2.)  It has pharmacies throughout the country, including one in Fridley, Minnesota.  (Id. ¶ 3; Noreen Dep. at 14.)

Noreen is a licensed pharmacist who was hired to work at Pharmerica's Fridley pharmacy in 1975.  (Noreen Dep. at 14.)  In 1983 he was promoted to manager, a position he held until a corporate reorganization in 1999.  (Id. at 15, 19.)  Generally speaking, he received positive performance reviews, although in the 1990s he was placed on a performance improvement plan due to several deficiencies in his management of the Fridley pharmacy; his personnel file and reviews also document, from time to time, communication issues with his co-workers.  (Muzumdar Decl. Exs. 7, 17-21.)

## II.      Declining business in Fridley, the first RIF, and the RIF Matrix

Pharmerica's staffing needs at a given pharmacy are tied to the number of patients the pharmacy serves.  (Rife Dep. at 56.)  Starting in mid-2012, the number of patients served by the Fridley pharmacy declined as a result of Pharmerica's loss of several large clients.  (Rife Decl. ¶ 4; Muzumdar Decl. Ex. 8.)  As a result, it decided to reduce the number of pharmacists in Fridley.  (Rife Dep. at 55-56.)

The first reduction in force (RIF), consisting of one pharmacist, took place in September 2012.  (Rife Decl. ¶ 6; Muzumdar Decl. Ex. 9.)  Corey Rife, Pharmerica's Regional Pharmacy Director for the West Central Region, made the decision which pharmacist would be laid off.  (Rife Decl. ¶ 6.)  To do so, he used a "RIF Matrix" that

had been prepared by Pharmerica's outside counsel and was sent to him by Jesse Nelson, a Pharmerica Human Resources (HR) Generalist. (Nelson Dep. at 45-47; Muzumdar Decl. Ex. 9.) Before sending the Matrix to Rife, Nelson filled in demographic information for each pharmacist, including his or her age. (See Muzumdar Decl. Ex. 9.)

The Matrix's Guidelines set forth sequential steps a manager was supposed to follow. (Id.) At the first step, the manager was to identify the departments and jobs to be affected, determine a timeline for the RIF and the number of positions to be eliminated, and notify HR. (Id.) Next, the manager was to rank employees in affected job categories by the overall grades they had received at their most recent annual performance appraisals; from highest to lowest, the grades were O (outstanding), E (exceeds expectations), M (meets expectations), NI (needs improvement), and U (unacceptable). (Id.; Norvold Aff. Ex. 22.) At the next step, the manager was to "[s]ub-rank ALL employees within the Performance Evaluation rating from highest to lowest," while "indicat[ing] what documentable reasons [were] used in assigning the [sub-]rankings." (Muzumdar Decl. Ex. 9.) In other words, if four employees had received an O grade at their most recent appraisals, those employees were to be sub-ranked within that grade from 1 to 4. The employees having received an E grade would then be sub-ranked in the same fashion, and so on through the grades M, NI, and U. Once the sub-rankings were complete, persons were to be "selected for RIF based on being the lowest rating." (Id.) The Matrix was then to be sent to HR, along with "documentation to support rankings and Sub-[rankings]," in order to be "analyze[d]" for "adverse impact on protected classes per Federal guidelines." (Id.)

Every pharmacist working at Fridley had received an M grade at his or her performance appraisal immediately prior to the September 2012 RIF, except for two hired in 2012 who had not yet been reviewed.  (Id.)  As all the pharmacists were essentially "tied," Rife, who was based in Nebraska, sub-ranked them jointly using information provided to him by Mike Koski, a long-time Fridley employee and former Chief Pharmacist there.  (Rife Decl. ¶ 6.)  Based on that information, Noreen ranked 10th out of the 11 staff pharmacists; the last-ranked pharmacist, who was also the youngest and the newest hire, was laid off.  (Muzumdar Decl. Ex. 9.)

## III.    Teich is hired and RIFs continue

Shortly after the September 2012 RIF, Pharmerica hired Dan Teich, then 29 years old, to manage the Fridley pharmacy; Teich reported to Rife.  (Teich Dep. at 20; Rife Dep. at 9-10.)  Business in Fridley continued to fall after Teich was hired, however, leading him to RIF additional pharmacists.

In December 2012, Teich laid off two pharmacists.  (Muzumdar Decl. Ex. 10.)  To do so, he used the same Matrix Rife had used for the September 2012 RIF.  And once again, Nelson prepopulated the Matrix with the pharmacists' ages before sending it to Teich.  (Id.)  At the time, the pharmacists ranged in age from 36 to 64, but only two were under 50 (36 and 48) and three, including Noreen, were over 60.  (Id.)

As in September 2012, all of the pharmacists had received an M grade at their most recent annual reviews, except for one too new to have been reviewed, so they were all grouped together.  (Id.)  Teich then sub-ranked them based on ten criteria, including communication skills, accuracy, organizational knowledge, and reliability.  (Id.)  Noreen

placed 8th out of the 10 pharmacists in the sub-rankings, with good scores for productivity and customer service but poor scores for versatility, communication, and being a team player.  (Id.)  Ultimately, the two lowest-ranked pharmacists, ages 48 (the second-youngest) and 61 (the third-oldest), were laid off.  (Id.)

Then, Teich RIFed another pharmacist in October 2013, again using the RIF Matrix.  (Id. Ex. 11.)  Between the December 2012 and October 2013 RIFs, however, the pharmacists had received their annual evaluations.   Hence, this time they did not all fall within one grade – rather, one had an E grade; four had an M grade, including Noreen; and three had an NI grade.  (Id.)  One of the three NI pharmacists, 55-year-old Michael Kelly, was chosen for layoff; the two others with NI grades, who were retained, were younger (52) and older (62) than Kelly.  (Id.)

As a result, following the October 2013 RIF, seven staff pharmacists remained at Fridley with ages ranging from 36 to 65.  Only one was younger than 52 and three, including Noreen, were over 60.  (Id.)

## IV.     The December 2013 RIF

By December 2013, business in Fridley had fallen 30% from the same period in 2012.  Accordingly, Rife determined that two additional pharmacists should be laid off, and he left the task of selecting those pharmacists to Teich.  (Rife Decl. ¶ 4; Rife Dep. at 68.)  As before, Nelson sent Teich a RIF Matrix to determine which pharmacists would be chosen, and once again he prepopulated the Matrix with the pharmacists' ages (then 36, 52, 53, 54, 61, 62, and 65).  (Muzumdar Decl. Ex. 12.)  Of the seven, one had an E grade; four, including Noreen, had M grades; and two had NI grades.  (Id.)  Therefore, if

the Matrix Guidelines had been strictly followed, the two NI-graded pharmacists (David

Pelto, age 52, and David Tschida, age 62) should have been laid off.

But that is not what happened. Instead, Teich sub-ranked *all* of the pharmacists

together *as one group*, even though they had received three different grades in their most

recent annual reviews.[1]  And when he sub-ranked the seven pharmacists, Noreen and

Tschida had the lowest rankings; Noreen's poor showing was largely due to low scores

for communication and being a team player.  (Muzumdar Decl. Ex. 12.)  Teich then

selected Noreen (age 61) and Tschida (age 62) for the RIF, passing over 52-year-old

Pelto, even though he had received the lowest grade of NI on his most-recent annual

performance review.  Nelson and Rife approved Teich's choices.

The record is not entirely clear whether Teich and Nelson later spoke about the

termination decisions.  (Rife Decl. ¶ 8; Teich Dep. at 250-51; Nelson Dep. at 106-113;

Tech Decl. ¶¶ 2-3.)  However, it is undisputed Teich submitted no documentation to HR

to justify his selections, even though the Guidelines specified that a manager should

"indicate what documentable reasons [were] used in assigning the [sub-]rankings" and

provide documentation to HR when submitting the Matrix.  (Muzumdar Decl. Ex. 12.)

Nor did Nelson follow the Guidelines' instructions to "analyze" the Matrix for "adverse

impact on protected classes."  (Id.)  In fact, Nelson testified in his deposition that despite

---

[1] In his deposition, Teich testified he did so because he thought the annual grades were simply
one factor to be considered when evaluating which pharmacists should be terminated.  (Teich
Dep. at 213.)  Similarly, Nelson testified in his deposition that the Guidelines did not
automatically require the employees with the lowest annual appraisal grades to be ranked at the
bottom and, hence, the first employees to be subjected to a RIF.  (Nelson Dep. at 58, 64-65, 87-
88.)  But the Guidelines, in the Court's view, can reasonably be read to require those employees
with the lowest appraisal grades to be RIFed, and hence the Court assumes that is true for
purposes of the instant Motion.

the instructions, Pharmerica *never* performed adverse impact analyses when conducting RIFs. (Nelson Dep. at 14-15.)[2]

## V.      Noreen is informed of his termination

Rife and Teich met with Noreen on December 30, 2013, to inform him that he was being let go. (Noreen Dep. at 77.) The meeting did not go well. According to Noreen, Teich and Rife acted like "assholes." (Id. at 82.) He became upset and criticized Teich's management of the Fridley pharmacy. (Id. at 85.) He demanded an explanation for his dismissal, and Rife commented that he had "heard something about inflexibility." (Id. at 78.) Noreen then pointed his finger at Teich,[3] accusing him of executing a "Pearl Harbor screw job," meaning a "sneak attack" that he "didn't deserve," and demanded that Teich explain his dismissal; Teich refused. (Id. at 79, 82, 84-85.) Teich later left the room, but Noreen continued to criticize him to Rife. (Id. at 83-84.)[4]

Eventually, Noreen was informed that he could re-apply for a position with Pharmerica, he cleaned out his locker, and left the premises. (Id. at 80-81.) Rife testified that he found Noreen's behavior "very unprofessional" and that he had never had a meeting with a similar "tone or direction." (Rife Dep. at 76.) Later that evening, Teich

---

[2] Nelson later backtracked and claimed that he had, in fact, performed an adverse-impact analysis on the December 2013 RIF. (Nelson Dep. at 71-72.) For purposes of the present Motion, the Court accepts Nelson's earlier testimony that no such analysis was performed. See, e.g., Prosser v. Ross, 70 F.3d 1005, 1009 (8th Cir. 1995) (court at summary judgment should not accept as true deposition testimony that the witness "flatly contradicts . . . in other parts of his testimony").

[3] Teich testified in his deposition that Noreen reached across the table and stuck his finger in Teich's face, which Noreen denies. It is undisputed, however, that Noreen was "upset" at the meeting and pointed his finger *at* Teich.

[4] Rife testified in his deposition that he asked Teich to leave the room because of Noreen's threatening demeanor. (Rife Dep. at 75.)

sent himself an email memorializing his reasons for the poor sub-rankings he had given

to Noreen as part of the RIF process.  (Norvold Aff. Ex. 32.)[5]

Noreen informed his wife that he had been laid off as soon as he arrived home.

(Noreen Dep. at 88.)  She became upset and called Teich, loudly asking, "how [do] you

have the balls to lay off my husband after all these years of service?"  (Id. at 89; D.

Noreen Dep. at 14-15.)  She told him "everybody at that place hates your [expletive]

guts" and "this isn't the last of this, this is the beginning."  (Noreen Dep. at 90; D. Noreen

Dep. at 15.)  She also called him a "son of a bitch."  (D. Noreen Dep. at 15.)  The call

frightened Teich and left him concerned for his personal safety.  (Teich Dep. at 166-67.)

Noreen's wife also called Rife the next day and told him, "you fired the wrong guy."

(Noreen Dep. at 92; D. Noreen Dep. at 22.)

## VI.    Pharmerica posts openings in Fridley and Noreen applies

In early January 2014, Rife requested approval to hire up to 2-1/2 additional staff

pharmacists in Fridley, to cover potential new work from Pharmerica's acquisition of an

additional client, Keaveny Long-Term Care (Keaveny).  (Id. Ex. 36.)  Rife had been

informed of the acquisition in November 2013 and had actually expressed to Nelson

some hope that it could prevent RIFs in Fridley.  (Norvold Aff. Ex. 46.)  Teich learned of

the Keaveny acquisition sometime in December, but there is no evidence in the record

that he believed it might stave off the December 2013 RIF.  Rather, he learned sometime

---

[5] Noreen suggests there was something untoward about Teich sending this email, but in the
Court's view it makes eminent sense that Teich would want to document the grades he had
assigned to Noreen after having had such a volatile termination meeting.

in early January (either January 3 or 7) that he had authority to hire in Fridley.  (Teich Dep. at 72.)

On January 8, 2014, Rife authorized recruiter Jackee Brown to post an opening for a staff pharmacist in Fridley; she posted the position on January 10.  (Norvold Aff. Exs. 34-35.)  Noreen promptly applied, and he reapplied when the position was re-posted on February 7, but he received no response to his applications.  Indeed, Teich testified in his deposition that he did not consider Noreen for the position due to the way he had acted in his termination meeting on December 30.  (Teich Dep. at 91.)  Rife, too, testified that he would not have supported rehiring Noreen for the same reason.  (Rife Dep. at 107-09.)  Ultimately, no one was hired for the position because the Keaveny acquisition only resulted in a minor increase in business.  (Rife Dep. at 58-59, 105; Teich Dep. at 92-98; Brown Dep. at 120.)

Then, in late February 2014, Koski resigned.  Teich reached out to Matt Larson to fill the opening; Teich and Larson had previously worked together at Walgreen's and Teich had encouraged him in the past to apply at Pharmerica.  (Teich Dep. at 60-62.)  Teich did not post an opening for Koski's position because he wanted to hire Larson (id. at 88-89), and Larson accepted the position on March 11, 2014 (Norvold Aff. Exs. 60-61).  He was 34 years old.

Several months later, staff pharmacist Kelly Owens also resigned.  Once again, Teich had a preferred candidate for the position:  Lucas Anderson, a new graduate from pharmacy school with whom Teich also had previously worked at Walgreen's.  (Teich

Dep. at 120-24.)  Anderson was offered the position on May 30, 2014, and he accepted a few days later.  (Norvold Aff. Ex. 69.)  He was 27 years old when hired.  (Id. Ex. 67.)

## VII.  Noreen alleges discrimination

When Noreen learned that two significantly younger pharmacists had been hired in Fridley, he filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC).  After exhausting his administrative remedies, he commenced this action in July 2014.  His Complaint alleges that Pharmerica terminated his employment in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, the Minnesota Human Rights Act (MHRA), Minn. Stat. § 363A.01 *et seq.*, and the Minnesota Dismissal for Age Act (MDAA), Minn. Stat. § 181.81.  In addition, he alleges that Pharmerica failed to rehire him on account of his age, in violation of the ADEA and the MHRA.[6]  With discovery complete, Pharmerica now moves for summary judgment.  The Motion has been fully briefed, the Court heard oral argument on June 24, 2015, and the Motion is now ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557

---

[6] The Complaint also refers to a "Separation Agreement" given to Noreen at his termination meeting, which allegedly waived any claim of age discrimination he might have, and in Counts VI and VII he seeks a declaration that the Agreement is invalid.  Yet, it does not appear Noreen ever signed the Agreement (Noreen Dep. at 79-80), and Pharmerica's counsel confirmed at oral argument that it is neither relying on the Agreement nor arguing that Noreen has waived his claims.  Accordingly, Counts VI and VII are moot.

U.S. 557, 586 (2009).  The moving party bears the burden of showing that the material

facts in the case are undisputed.  <u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1042

(8th Cir. 2011) (*en banc*);[7] <u>Whisenhunt v. Sw. Bell Tel.</u>, 573 F.3d 565, 568 (8th Cir.

2009).  The Court must view the evidence, and the inferences that may be reasonably

drawn from it, in the light most favorable to the nonmoving party.  <u>Beard v. Banks</u>, 548

U.S 521, 529-30 (2006); <u>Weitz Co., LLC v. Lloyd's of London</u>, 574 F.3d 885, 892 (8th

Cir. 2009).  The nonmoving party may not rest on mere allegations or denials, but must

show through the presentation of admissible evidence that specific facts exist creating a

genuine issue of material fact for trial.  Fed. R. Civ. P. 56(c)(1)(A); <u>Wood v. SatCom</u>

<u>Mktg., LLC</u>, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

### I.  Age-discrimination law generally

The ADEA, MHRA, and MDAA all render it unlawful for an employer to

discharge or refuse to hire an individual because of his age.  29 U.S.C. § 623(a)(1); Minn.

Stat. § 363A.08, subd. 2(1)-(2); Minn. Stat. § 181.81, subd. 1.  Claims under the three

statutes are analyzed in the same fashion.  <u>E.g.</u>, <u>Chambers v. Travelers Co.</u>, 668 F.3d 559,

566 (8th Cir. 2012); <u>Riebhoff v. Cenex/Land O'Lakes Agronomy Co.</u>, No. C6-98-1205,

1998 WL 901749, at *2 (Minn. Ct. App. Dec. 29, 1998).

---

[7] Several Eighth Circuit cases cited herein have a "red flag" on Westlaw as a result of <u>Torgerson</u>,
which abrogated a litany of decisions suggesting summary judgment should be sparingly granted
in discrimination cases.  Because this Court has cited these cases for different legal principles
that remain good law, it has not indicated such abrogation.

When confronted with a summary-judgment motion in an age-discrimination action, a plaintiff may defeat the motion either with "direct evidence" of discrimination or by creating an inference of discrimination under the familiar framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Gibson v. Am. Greetings Corp., 670 F.3d 844, 853 (8th Cir. 2012). Noreen does not rely on direct evidence here,[8] and hence the Court considers his claims under McDonnell Douglas, which requires him, at the first step, to establish a prima facie case of discrimination. Id. If he does so, "the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for its actions. If the defendant offers such a reason, the burden shifts back to the plaintiff to put forth evidence showing the defendant's proffered explanation is a pretext for unlawful discrimination." Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 914 (8th Cir. 2007) (citations omitted).

As the undersigned has noted, the elements of a prima facie case in an age-discrimination action are not well established in our Circuit. See, e.g., Hilde v. City of Eveleth, 968 F. Supp. 2d 1068, 1074-75 (D. Minn. 2013) (Kyle, J.), rev'd, 777 F.3d 998 (8th Cir. 2015).[9] But the Court need not wade into the morass, because once a defendant

---

[8] At oral argument, Noreen's counsel noted that Teich first answered "I don't know" when asked in his deposition if he had used age data when deciding which employees would be laid off in December 2013. Yet, he nowhere argues this is "direct evidence" of discrimination.

[9] While the first three elements have been stated consistently – the plaintiff (1) was over 40, (2) suffered an adverse employment action, and (3) was meeting the employer's expectations or was qualified for the job – the last element has not. Some cases require a plaintiff to show he was replaced with someone *younger*, see, e.g., Tusing v. Des Moines Indep. Cmty. Sch. Dist., 639 F.3d 507, 515 (8th Cir. 2011), which seems contrary to the Supreme Court's admonition that discrimination "cannot be [shown] from the replacement of one worker with another worker *insignificantly* younger," O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 313 (1996)

has proffered a legitimate, nondiscriminatory reason for its actions, a court may skip the prima facie case and proceed directly to the ultimate question of discrimination *vel non*. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983); Wagner v. Gallup, Inc., 788 F.3d 877, 886 (8th Cir. 2015); Hilde, 777 F.3d at 1004. Indeed, "the McDonnell Douglas test . . . 'drops out of the picture' once the defendant has proffered a legitimate, nondiscriminatory reason for its actions." Zacharias v. Guardsmark, LLC, Civ. No. 12-174, 2013 WL 136240, at *5 (D. Minn. Jan. 10, 2013) (Kyle, J.) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993)).

Pharmerica has proffered a legitimate, nondiscriminatory reason for its actions here: the loss of business in Fridley requiring it to engage in a series of RIFs, including the December 2013 RIF in which Noreen's employment was terminated, and with respect to the failure to rehire, Noreen's conduct in the termination meeting. Accordingly, the Court need not (and will not) address the prima facie case, because it is irrelevant to the final analysis. Rather, the Court will turn directly to whether Noreen has proffered sufficient evidence to avoid summary judgment on the "ultimate question" of age discrimination. EEOC v. Trans States Airlines, Inc., 462 F.3d 987, 992 (8th Cir. 2006).

---

(emphasis added). For instance, can one infer discrimination from the replacement of a 65-year-old with a 64-year-old? Other cases have required the plaintiff to show he was replaced with someone *substantially* younger, see, e.g., Holmes v. Trinity Health, 729 F.3d 817, 822 (8th Cir. 2013), but the Circuit has not drawn a clear line between a younger employee and a substantially younger one. Compare Chambers v. Travelers Co., 668 F.3d 559, 566 (8th Cir. 2012) (8-year age gap insufficient), with Hilde, 777 F.3d at 1004 (8-year difference *is* sufficient). Adding to the confusion is case law requiring a plaintiff terminated as part of a RIF to make an *additional* showing that "age was a factor in his or her termination," Hannebrink v. Brown Shoe Co., 110 F.3d 644, 646 (8th Cir. 1997), such as "evidence [of] comments and practices [showing] a preference for younger employees," Stidham v. Minn. Mining & Mfg., Inc., 399 F.3d 935, 938 (8th Cir. 2005) (internal parentheses deleted), or "statistical evidence such as a pattern of forced early retirement or a failure to promote older employees," Hannebrink, 110 F.3d at 646.

**II.      No genuine issue exists regarding either the layoff or the failure of rehire**

   **A.      The December 2013 RIF**

Noreen's main allegation is that he was laid off because of his age.  In the Court's view, there is insufficient evidence in the record to support that contention.

   **1.      No evidence of age bias by Teich**

The most forceful evidence Noreen cites to support his claim is that Teich deviated from Pharmerica's policies – specifically, the RIF Matrix and its Guidelines for ranking candidates – when deciding who should be laid off in December 2013.  True, Teich failed to follow the Guidelines by failing to *first* rank candidates by the scores received on their most recent annual appraisals and *then* sub-ranking them within each of those grades.  Instead, Teich lumped all of the Fridley staff pharmacists together and sub-ranked them jointly, with two of the oldest pharmacists (Noreen and Tschida) receiving the lowest sub-rankings.  And while Tschida would have been one of the two selected for layoff had the Guidelines been followed (since he had received a grade of NI at his most recent review), Noreen was chosen as the second pharmacist for layoff over Pelto, who had received a lower annual score.  The upshot, then, is that Teich's deviation from the Guidelines affected only Noreen.  And an "employer's failure to follow its own policies may support an inference of [discrimination] when the departure affects only the" plaintiff.  Hilde, 777 F.3d at 1007; accord, e.g., Dixon v. Pulaski Cnty. Special Sch. Dist., 578 F.3d 862, 871 (8th Cir. 2009).

In the Court's view, however, Teich's policy deviation in December 2013 tells only part of the story.  See, e.g., Gilbert, 495 F.3d at 916 (deviation from policy alone

insufficient); <u>Chock v. Nw. Airlines, Inc.</u>, 113 F.3d 861, 864-65 (8th Cir. 1997) (same). The Court finds it far more noteworthy that Teich was responsible for two RIFs in the year prior to the one in which Noreen's employment was terminated, and in neither of those instances was Noreen chosen for layoff. More importantly, the persons terminated as part of those RIFs fell *all along the spectrum of the Fridley pharmacists' ages* – there is no evidence, or even a reasonable inference, that Teich targeted the older pharmacists in Fridley.

For example, immediately prior to the December 2012 RIF, the ten Fridley staff pharmacists (listed in reverse-age order) were:

| Name | Age |
| --- | --- |
| Lynne Schneider | 64 |
| Nicholas Thrune | 61 |
| David Tschida | 61 |
| Loren Noreen | 60 |
| Michael Kelly | 54 |
| Michael Koski | 53 |
| Shelly Nauman | 52 |
| David Pelto | 51 |
| Ann Hanes | 48 |
| Kelly Owens | 36 |

Recall that as part of this RIF, *all* of the pharmacists were grouped together when they were initially ranked, as all had received the same grade (M) at their most recent annual appraisals.[10]  In these circumstances, if Teich were truly intent upon age discrimination, one would expect him to have scored Schneider and Thrune, the two oldest pharmacists, poorly in order to terminate them.  Indeed, this would have been a prime opportunity for him to single out the oldest pharmacists for termination, as all of the Fridley pharmacists were ranked together based upon their annual appraisal grades, meaning Teich's subjective sub-rankings would be the determinative factor.  Yet, Schneider received the third *highest* sub-ranking from Teich, who ultimately selected Thrune, the second oldest pharmacist, and Hanes, the second *youngest*, to be part of the RIF.  This hardly suggests someone bent upon pushing out Fridley's oldest employees.

Then, in October 2013 – just ten months later, and two months before the RIF in which Noreen was laid off – Teich conducted another RIF.  At that time, the eight Fridley staff pharmacists (again listed in reverse-age order) were:

| Name | Age |
|---|---|
| Lynne Schneider | 65 |
| David Tschida | 61 |
| Loren Noreen | 61 |
| Michael Kelly | 55 |
| Michael Koski | 54 |

---

[10] To be precise, Thrune did not have an annual appraisal grade because he was hired in 2012 and had not yet been reviewed in December 2012.

| Shelly Nauman | 53 |
| David Pelto | 52 |
| Kelly Owens | 36 |

Had Teich wanted to layoff the oldest pharmacists, he could have deviated from the Guidelines as part of *this* RIF and targeted Schneider, Tschida, or Noreen. But he did not. Instead, he followed the Guidelines and ranked three – Pelto, Kelly, and Tschida – at the bottom because of their NI grades. And from those three, *Teich did not select the oldest pharmacist* (Tschida), instead laying off Kelly, whose age fell in-between Pelto and Tschida.

Finally, though two of the oldest pharmacists (Noreen and Tschida) were laid off in the last RIF in December 2013, Schneider – the oldest – was not.

In the Court's view, the totality of these facts belies Noreen's contention that Teich was on a crusade to eliminate older employees. Teich had several opportunities to layoff older workers but consistently chose employees who were not at the top – or even *near* the top – of the age scale. Moreover, the oldest pharmacist in Fridley (Schneider) survived *all* of Pharmerica's 2012-2013 RIFs, as did Noreen until the very last RIF, despite his consistently low rankings. Given these circumstances, in the Court's view Teich's one-time deviation from Pharmerica's policies in December 2013 at best "create[s] only a weak issue of fact as to whether [Pharmerica']s reason was untrue" and is not enough to get Noreen past summary judgment. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000); accord, e.g., Tatom v. Ga.-Pac. Corp., 228 F.3d

926, 932 (8th Cir. 2000) (recognizing that "in an ADEA case it may not be enough for a jury to disbelieve the employer; the fact finder must have evidence on which to base a reasonable belief that age was a determining factor").

Noreen points out that Teich's decision to terminate his employment was predicated on a host of "unsubstantiated" subjective factors comprising the sub-rankings. (Mem. in Opp'n at 43.) To be sure, as this Court has previously noted, the use of subjective criteria in employment decisions must be carefully scrutinized. Bundy v. U.S. Bank Nat'l Ass'n, 972 F. Supp. 2d 1055, 1063 (D. Minn. 2013) (Kyle, J.) (citing Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1080 (8th Cir. 2008)). But here, the factors cited by Teich – communication problems, lack of being a team player, and the like – were well-documented. Indeed, Noreen's employment file and annual reviews repeatedly contained mention of problems interacting with his co-workers. Moreover, Teich consistently scored Noreen poorly in these areas across each of the RIFs, and *Rife* ranked Noreen 11th out of 12 Fridley pharmacists when conducting the September 2012 RIF, before Teich was even hired, based on information provided to him by Koski, one of Noreen's long-time colleagues (and ostensible friends). (See Noreen Dep. at 9-10.) Although subjective criteria are "easily fabricated," Wingate, 528 F.3d at 1080, here they are a consistent theme in the reviews of Noreen's performance.[11]

---

[11] Noreen argues they are *not* consistent because Teich told him, in early 2013, to "keep doing what you're doing." But this comment was made shortly after Teich was hired and before he had a significant opportunity to interact with Noreen. Moreover, the comment came before Teich received complaints about Noreen's conduct; several employees complained to Teich and Rife that Noreen was a "bully" and frequently yelled at others.

Noreen also argues that statistics reveal Teich's age bias.  For example, he notes the five pharmacists terminated as a result of the RIFs conducted by Teich were an average of 54.1 years old.  (Mem. in Opp'n at 4.)  Putting aside the oft-quoted maxim "there are lies, damned lies, and then there are statistics," United States v. Jackson, 825 F.2d 853, 875 n.2 (5th Cir. 1987) (*en banc*) (Hill, J., concurring specially) (attributing the quote to Mark Twain), the Eighth Circuit has recognized that statistics may be "useful in establishing the presence or absence of a general climate of age bias."  MacDissi v. Valmost Indus., Inc., 856 F.2d 1054, 1058 n.3 (8th Cir. 1988).  But statistics here are misleading, because most of the pharmacists employed in Fridley were over 50.  Hence, it would have been nigh impossible for Teich to have laid off *any* five pharmacists with an average age much lower than the ones actually chosen.  Consider, for example, the top chart above, which shows the five youngest pharmacists in Fridley when Teich was hired were 36, 48, 51, 52, and 53 – an average age of 48.  In other words, even if Teich had chosen to lay off these five *youngest* Fridley pharmacists, the average age of the persons laid off would not have been substantially different from those who were actually selected (54.1).  Moreover, the average age of Fridley's full-time pharmacists in December 2012, before Teich's first RIF, was 54, while the average age immediately following Teich's final RIF, in December 2013, was 52 – hardly a dramatic shift.

Statistics also belie Noreen's argument that "[i]f an adverse impact analysis . . . for the RIFs at Fridley had been done," as the Matrix Guidelines suggest, "it would have failed because Teich laid off five of the nine pharmacists over age 40 and no pharmacist under age 40."  (Mem. in Opp'n at 18.)  This ignores that by the time Teich was hired,

*there was only one pharmacist under 40 working in Fridley.*  Accordingly, he could not

have laid off five pharmacists without at least four of them exceeding 40 years old.

Noreen also cites the average age of those *hired* by Teich in 2014, after Koski and

Owens had resigned.  (Mem. in Opp'n at 4-5.)  Yet, he points to no evidence in the record

identifying the applicants for these positions or their ages, other than himself and the

persons ultimately chosen (Matt Larson (34) and Lucas Anderson (27)).  Without

knowing, for example, whether Teich passed up older applicants in favor of younger ones

– save for Noreen, whose failure to be rehired is discussed more below – it is impossible

to draw any inference of age discrimination simply from the ages of the persons hired.

Indeed, it is distinctly possible the persons hired for the positions were the *only* applicants

besides Noreen.

Noreen also notes that Pharmerica kept track of the average age of its employees.

Yet, he points to no evidence that Teich, the decisionmaker here, was aware of that

information.  And although each RIF Matrix sent to Teich was prepopulated by Nelson

with the ages of the Fridley pharmacists, Teich testified in his deposition that he did not

recall having paid attention to that information.  (Teich Dep. at 242 (referring to age data

in the RIF Matrix:  "I don't know . . . [but] I don't believe I really paid much attention to

what was over in this column.").)  Noreen claims Teich changed his story in the

Declaration filed with the instant Motion (see Teich Decl. ¶ 5 ("I did not consider age in

determining which employees to terminate.")), but the Court perceives no material

contradiction.

Lastly, Noreen argues that several comments he attributes to Teich are evidence of age bias. "[H]ere as in all areas of discrimination law, we hesitate to rely on isolated comments as proof of bias, lest the law become a 'general civility code.'" Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1113 (8th Cir. 2001) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). Regardless, these (alleged) comments do not aid his cause.

First, in his EEOC charge Noreen asserted that Teich "told a 65-year-old pharmacist at the Fridley location that, 'Your generation is different from my generation' because 'my generation has an emphasis on family rather than other activities.'" (Norvold Aff. Ex. 72.) Teich denies the statement. (See Teich Decl. ¶ 6.) Arguably, *Teich's* (alleged) statement is not hearsay because it is an "admission" under Federal Rule of Evidence 801(d)(2). But Noreen claims he heard the statement from Schneider (Noreen Dep. at 49), and *Schneider's* statement *to him* would be hearsay. See, e.g., United States v. Singh, 494 F.3d 653, 659 (8th Cir. 2007) (out-of-court statement in which defendant's alleged admission was relayed to testifying witness was hearsay). Of course, the Court cannot consider hearsay at summary judgment. See, e.g., Brunsting v. Lutsen Mountains Corp., 601 F.3d 813, 817 (8th Cir. 2010) ("[T]he Federal Rules of Evidence generally prohibit admissions of hearsay evidence, and . . . inadmissible hearsay evidence cannot be used to defeat summary judgment.") (citation omitted).

Second, Noreen alleged in his EEOC charge that Teich "criticized the older pharmacists at Pharmerica as being 'resistant to change.'" (Norvold Aff. Ex. 72.) But in his deposition, Noreen testified he was unsure if this comment was directed to *all* of the

Fridley pharmacists, and he later testified he was not aware of any instance in which such a comment was directed only to *older* pharmacists. (Noreen Dep. at 48-49, 159.) Under the circumstances, the statement does not evince age bias.

Third, Noreen points out that in his December 30, 2013 termination meeting, he asked Rife for an explanation why he was being let go, and Rife responded that he had "heard" (apparently from Teich) that Noreen was "inflexible." (Rife Dep. at 76; see also Noreen Dep. at 80-81.) Besides once again constituting hearsay, there is simply nothing about this statement to suggest it was ageist; it was facially neutral. But even assuming the statement was made and could be considered ageist, it does not, in the Court's view, suffice to create a genuine issue that Teich targeted Noreen for the RIF due to his age.[12]

## 2. The RIF explanation stands unrebutted

Noreen also argues that Pharmerica's RIF explanation is unworthy of credence. He notes that the company authorized 2-1/2 additional pharmacists to be hired in Fridley less than two weeks after the December 2013 RIF, belying any suggestion that a decline in business necessitated his layoff. (Mem. in Opp'n at 44 ("[T]hat Pharmerica authorized the hiring of 2-1/2 pharmacists for Fridley within days after terminating Noreen based on new business that Pharmerica had already acquired in mid-December 2013 calls into question the validity of the RIF itself.").) But he offers no evidence rebutting the consistent testimony of Rife, Teich, and Brown that no pharmacists were hired for these positions because the increased business from Keaveny turned out to be miniscule. And

---

[12] Noreen also points to a statement allegedly made by Rife, expressing a preference for "new grads." (Mem. in Opp'n at 46.) But Noreen admits Rife did not make the decision to terminate him (id. at 45), and hence the comment, assuming it was made, is merely a stray remark.

though he notes Pharmerica hired two staff pharmacists in 2014, it is undisputed each

was hired only *after* a Fridley pharmacist had resigned; the total headcount of

pharmacists in Fridley was unchanged from December 2013 after these replacements

were hired. Most notably, Noreen himself acknowledged Fridley's loss of business and

testified in his deposition that he knew positions were going to have to be eliminated.

(Noreen Dep. at 55-56, 61.) The facts simply do not suggest Primerica's proffered

explanation is untrue.[13]

Noreen further contends that Pharmerica's explanation for his layoff has shifted

over time. He argues Pharmerica offered the RIF as an explanation in response to his

EEOC charge, but now "attempts to supplement its explanation with irrelevant fodder

such as his supposed reputation as a 'bully' and the complaints of [a] former co-worker."

(Mem. in Opp'n at 40.) To be sure, an employer's shifting explanations for an

employee's discharge can be probative of discrimination. See, e.g., Wierman v. Casey's

Gen. Stores, 638 F.3d 984, 1001 (8th Cir. 2011). But merely "supplementing" a

previously given reason with additional facts does not suggest an employer is

dissembling, as long as the additional facts do not contradict the prior articulated reason.

Id. That is precisely the case here. Pharmerica has consistently stated the December

2013 RIF was the reason for Noreen's discharge; it has simply supplemented that

---

[13] At times, Noreen also appears to suggest that Pharmerica should have laid off two "per diem" pharmacists employed in Fridley. But it is undisputed the cost savings from doing so would not have been sufficient to achieve Pharmerica's budgetary goals (see Rife Dep. at 69; Teich Dep. at 182), and in any event, those individuals were 66 and 55 years old. (Muzumdar Decl. Ex. 12.)

explanation here with the reasons *why* Noreen was selected for the RIF.  There is no inconsistency or change suggestive of discrimination.

### 3.     The laptop and cell-phone are red herrings

Finally, Noreen attempts to argue Pharmerica has spoliated evidence and that the Court should infer the destroyed evidence suggested discrimination.  (Mem. in Opp'n at 50-51.)  In particular, he points out that Teich's laptop computer profile was deleted four months after this action was filed and that his cell phone was "wiped clean" and donated to a third party.  (Id.)

But Teich's laptop was backed up before his profile was deleted, and Pharmerica produced responsive documents from that backup.  (Muzumdar Decl. Ex. 138.)  As for the cell phone, Teich testified in his deposition that he did not use it for work matters, save for messages such as, "Pick me up from the airport."  (Teich Dep. at 74.)  In any event, records from the cell carrier could have been subpoenaed by Noreen but apparently have not been.  No spoliation inference is appropriate under the circumstances.  See, e.g., Greyhound Lines, Inc. v. Wade, 485 F.3d 1032, 1035 (8th Cir. 2007) (adverse inference appropriate where there exists an "intentional destruction [of evidence] indicating a desire to suppress the truth"; mere fact that lawsuit has been filed or is likely to be commenced does not ineluctably lead to adverse inference where evidence is destroyed); Applied Telematics, Inc. v. Sprint Commc'ns Co., L.P., No. Civ. A. 94-4603, 1996 WL 33405972, at *4 (E.D. Pa. Sept. 17, 1996) (no adverse inference where destroyed evidence was available to plaintiff from other sources).

For all of these reasons, the Court concludes that Noreen has failed to create a genuine issue that his termination was discriminatory.

## B.     The failure to rehire

The Court need not linger long on Noreen's claims regarding Pharmerica's failure to rehire him.  Noreen points to the same evidence already discussed in an attempt to show the failure to rehire was discriminatory, but the Court has determined it does not suffice.  Yet, the Court would grant summary judgment to Pharmerica in any event on the failure-to-rehire claims, because its proffered reason – Noreen's conduct in the December 30, 2013 termination meeting – "gives an explanation . . . other than a discriminatory motive."  Wierman, 638 F.3d at 998.

While Noreen disputes precisely what happened in the meeting, it is undisputed he became upset, called his termination a "Pearl Harbor screw job," pointed his finger at Teich, and criticized Teich repeatedly to Rife.  It is equally undisputed that Noreen's wife called Teich later that evening, swore at him and made vaguely threatening statements which left him concerned for his safety.  And Teich and Rife each testified in his deposition that he would not consider Noreen for re-employment in light of his conduct at the meeting.  Given these facts, the record simply does not, in the Court's view, create a genuine issue whether Pharmerica failed to rehire Noreen because of his age.

Noreen contends Pharmerica's proffered reason is pretextual because it "was never documented to anyone within or outside the company until after Noreen filed a Charge of Discrimination."  (Mem. in Opp'n at 48.)  But he points to no company policy or other evidence suggesting that either Teich or Rife was required to document his conduct at the

termination meeting, or even respond to his applications with an explanation why he would not be considered for rehire.  Noreen also argues that his wife's phone calls could not have been a real reason, as Nelson (from HR) testified in his deposition that Pharmerica "wouldn't consider [] any aspect of a spouse" in a hiring decision.  (Id. at 29-30.)  But Nelson offered that testimony in response to a number of hypotheticals about a spouse's *race* or *health problems*, not whether a spouse had made expletive-laden or threatening phone calls to a supervisor.  (Nelson Dep. at 166-67.)  And in any event, there is no evidence of any formal policy regarding spouses, nor a suggestion that Teich was aware of such a policy, assuming it existed.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Pharmerica's Motion for Summary Judgment (Doc. No. 53) is **GRANTED** and Noreen's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date:  July 31, 2015                                    s/ Richard H. Kyle
                                                        RICHARD H. KYLE
                                                        United States District Judge